Filed 2/22/22  In re J.R. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>O.R.,<br><br>        Defendant and Appellant. | E076792<br><br>(Super.Ct.No. J279879)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant.

Steven O'Neill, Interim County Counsel, and Kaleigh Ragon, Deputy County Counsel, for Plaintiff and Respondent.

1

A juvenile court terminated the parental rights of defendant and appellant O.R. (father) as to his son, J.R. (the child). On appeal, father contends the court erred by finding the beneficial parental relationship exception to termination of parental rights inapplicable. (Welf. & Inst. Code,[1] § 366.26, subd. (c)(1)(B)(i).) We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2015, the child was the subject of a dependency case. He was in the care and custody of his mother, S.R. (mother),[2] and her boyfriend, A.G., at the time. A.G. physically abused the child, and the child sustained a broken arm. As a result, father was awarded legal and physical custody of the child.

In November 2018, there was an altercation between father and the paternal grandmother (PGM). The PGM threw a drink at him, and he hit her in the head and pushed the paternal aunt, in the presence of the child. The paternal aunt called law enforcement, and father was arrested on an outstanding warrant. Mother got temporary custody of the child, and father was granted supervised visits.

In February 2019, the San Bernardino County Children and Family Services (CFS) received a referral alleging general neglect and emotional abuse by father and mother (the parents). Two social workers went to mother's home, and A.G. answered the door. The

---

[1] All further statutory references will be to the Welfare and Institutions Code unless otherwise noted.

[2] Mother is not a party to this appeal.

home had a strong smell of marijuana, and mother appeared to be under the influence. Mother reported that the child was at a supervised visit with father.

One of the social workers met with father, and he admitted to having a verbal altercation with his mother. Father said he was awarded custody of the child in October 2015, but was incarcerated on a burglary warrant, so mother picked up the child when he was incarcerated. When father was released on November 15, 2018, he went to mother's house to pick up the child, and mother said she had full custody of him.

The social worker met with the child at school, and the child said he lived with mother, the paternal grandfather, his aunt and uncle, his brothers, and A.G. The social worker asked if he was ever left alone with A.G., and he said yes. As a result, the social worker obtained a warrant to detain the child.

On February 21, 2019, CFS filed a section 300 petition on behalf of the child, who was six years old at the time. The petition alleged that he came within section 300, subdivisions (b) (failure to protect) and (j) (abuse of sibling). The petition included allegations that mother failed to provide adequate care and supervision in that she allowed her boyfriend, A.G., in her home knowing that he had caused severe physical injury to the child, and that mother had a prior dependency case when the child was previously abused by A.G. The petition also alleged that father engaged in criminal activity, failed to protect and provide adequate care for the child, and had a history of domestic violence.

The court held a detention hearing on February 22, 2019, and detained the child in foster care.[3]

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on March 12, 2019, and recommended that the court sustain the petition, declare the child a dependent of the court, and provide reunification services to father, but not mother. The social worker further interviewed both parents. Mother stated that the child had been in her care since November 7, 2018, because she filed for an emergency hearing in family law court and was granted temporary full custody. She said she received a phone call from father that he was being arrested, and he needed her to pick up the child. Mother said that as of February 2019, father had supervised visits and overnight visits with the child.

Regarding his recent arrest, father reported that he was verbally arguing with his mother, and his sister panicked and called the police. He denied hitting his mother. He described his relationship with mother as toxic and said they would engage in verbal altercations.

The social worker's assessment of father's reunification with the child was guarded. She was concerned since he was arrested due to the verbal altercation at his home when the child was present. She was also concerned that, although father was granted full legal and physical custody of the child, he allowed the child to be picked up

---

[3] The court also detained the child's brothers, but they are not subjects of this appeal.

by mother. The social worker opined that father placed the child at risk of being abused by not following the family law order.

The social worker reported that at the detention hearing on February 22, 2019, father was granted supervised visitation once a week. As of the writing of the report, he had had one supervised visit on February 28, 2019, and there were no concerns. The social worker further reported that the child was currently placed with the maternal great aunt, who was willing and able to care for him and would provide permanency if needed.

The court held a jurisdiction/disposition hearing on March 15, 2019, and ordered mediation for father. It set a contested jurisdiction/disposition hearing for April 30, 2019.

At mediation, CFS agreed to dismiss the allegation against father relating to his criminal activity and to rewrite the allegation concerning his substance abuse to say that he used marijuana, which placed the child at risk when used inappropriately. On April 9, 2019, father submitted a waiver of rights and submitted on the amended petition.

On April 25, 2019, the social worker submitted additional information to the court, reporting in part that father had a monitored visit with the child on April 19, 2019. The social worker reported that no concerns were observed, and that father and the child shared food and talked about topics such as books, cartoons, school, and homework.

The court held a contested jurisdiction/disposition hearing on April 30, 2019, and sustained the amended petition. The court found father to be the child's presumed father, declared the child to be a dependent, and removed him from the parents' custody. The court ordered reunification services for father and supervised visitation. It did not order services for mother but did order supervised visitation.

*Suspension of Visitation*

On August 2, 2019, the social worker submitted a non-appearance review packet requesting the court to suspend visitation with father. The packet stated that the child's therapist and other mental health providers were recommending that visits with father be stopped and moved to a therapeutic setting since the current visits were affecting the child emotionally. The child demonstrated anxiety and dysregulation following visits, making it difficult for him to fall asleep until 1:00 a.m. to 2:00 a.m. He was also having nightmares before and after visits, wetting his bed, hitting himself and others, having crying episodes, and having difficulty implementing coping skills. The social worker reported that the child's therapist and providers wanted to work with the child before he resumed visits with father. Thus, the social worker recommended suspending visitation between the child and father until the therapist recommended resuming them in a therapeutic setting.

Father filed an objection to the packet, and the court set a hearing on the objection on August 20, 2019.

On the day of the hearing, the social worker filed additional information for the court, including the Children and Adolescent Needs and Strengths Treatment Progress Report from the Department of Behavioral Health (DBH), dated August 16, 2019. It listed the child's troubling behaviors and stated that equipping his caregiver to help him cope was a necessary next step and recommended collaboration among all team members, including a Child and Family Team (CFT) meeting and a consultation between the social worker and the mental health providers.

6

The court held a hearing and noted father's objection to the packet. It asked his counsel if he had anything to add, and father's counsel stated that part of his objection was that he did not have anything from DBH, but he acknowledged the report that was just submitted. County counsel asked the court to make a finding that visits with father were detrimental and order that visits be suspended until the therapist recommended them to continue in a therapeutic setting. Counsel for the child joined in CFS's request. The court agreed but stated it did not like the wording of the packet and it was going to make its own order. The court then found that visits were detrimental and gave CFS the authority to resume visits in a therapeutic setting if it was in the child's best interest.

*Six-month Status Review*

The social worker filed a six-month status review report on October 24, 2019, recommending that father's services be continued. The social worker reported that father had completed his services. However, his supervised visits were suspended and moved to a therapeutic setting, due to the child's behaviors after visits. The child was having night terrors, was hitting and scratching himself, and was crying incessantly. The caregiver reported that during the time visits were suspended, the child did not display these behaviors; however, they returned once therapeutic visits commenced.

Father and the child began therapeutic visits with a family therapist at Outreach Nation on September 4, 2019. After five sessions, the therapist terminated visits, reporting that the therapeutic visits were detrimental to the child's well-being due to his continuing night terrors and self-harming behaviors after the visits. The family therapist told the social worker that the child appeared to be suffering from post-traumatic stress

7

disorder (PTSD); he was fragile and needed a break from therapeutic visits, as the sessions caused him significant distress. The social worker reported that father was having weekly meetings with the child's DBH therapist to gain insight into the child's behaviors and trauma.

The social worker further reported that the child was receiving therapeutic behavioral services (TBS) through South Coast Community Services, and recently graduated from the TBS program. The child was now receiving in-home therapeutic services with his DBH therapist once a week. The DBH therapist reported that since visits resumed with father in a therapeutic setting, the child had regressed in therapy. She said he would put his hands to his face and hide in the couch during sessions. The DBH therapist further reported that the child was aware of the upcoming hearing and was feeling uncertain. He asked her if he would be with his current caregiver for Halloween. She said he would, and he appeared happy and excited. The therapist also reported that the child recently vocalized he was scared to return home to father due to "hitting and yelling."

The social worker concluded that although father had completed his case plan, the child was not ready to return home, noting that he was displaying behaviors that were detrimental to his emotional and physical well-being. The social worker recommended there be no visitation between father and the child, and that father continue meeting the DBH therapist. The social worker further stated that it was important for the child to focus on his own therapeutic sessions and have the TBH therapist determine when he was ready to resume visits with father in a play therapy setting.

The court held a six-month review hearing on October 30, 2019, and the court continued father's services. The court adopted the findings and orders of the social worker and found that visitation between father and the child was harmful to the child's safety and/or emotional well-being. Thus, it ordered that there be no visitation between them.

*Section 388 Petition*

On February 13, 2020, father filed a substitution of attorney, which the court granted. On March 6, 2020, father's new attorney filed a section 388 petition asking the court to reinstate father's visitation. As to changed circumstances, the petition alleged that father had attended therapy and counseling, and that the child's aunt had a strong bias against him that she used to "terrorize" the child into saying he did not want to see father. As to best interests, the petition alleged that the child needed father in his life, father had proof the child was happy with him, and it was important for the child to know father was there for him.

The court denied father's request since the petition did not state new evidence or a change of circumstances, and the proposed change was not in the child's best interest.

*Twelve-month Status Review*

The social worker filed a 12-month status review report on May 27, 2020, recommending the court terminate reunification services and set a section 366.26 hearing. The social worker reported that the child was receiving therapeutic services with his DBH therapist, who said the child's behaviors of self-harm, hitting others, bedwetting, crying, and night terrors stopped around October 2019. She reported that the child

9

became open and engaged in therapy about his feelings regarding the parents when the family therapy with father stopped. The therapist reported that the child told her he did not want to visit his parents because it made him feel sad. The therapist said the child recalled the trauma of physical abuse from his stepfather and the argument he witnessed between father and the PGM. The therapist could not recommend play therapy since the child had verbalized that visiting his parents caused him emotional distress.

The social worker further reported that a CFT meeting was held on November 21, 2019, with the DBH therapist, the child, the caregiver, and herself. The child said that "not seeing [his] mom and dad" had been "good because it helps [him] not hit [himself]." The caregiver and the therapist confirmed that the child had made improvements in his behavior since he no longer hit himself, had nightmares, or wet the bed.

On January 15, 2020, a CFT was held with the therapist, the caregiver, father, the PGM, and two social workers. The child was reportedly doing well and had graduated from therapy. Father worried that he was being shut out of the child's life due to lack of visits. The therapist said she understood father wanted to visit the child, but based on the child's responses in therapy, she was unable to recommend play therapy. The therapist showed father some of the child's activities from therapy to demonstrate how the child felt sad and did not want to visit him.

Another CFT was held on March 11, 2020, and the social worker reported that the child had good grades, did his chores, helped his caregiver, and felt happy about being adopted. The social worker asked the child who he considered his mother and father, and the child responded, "Tia" (the caregiver) and "Uncle" (the caregiver's husband). The

social worker also asked if there was a reason why he did not want to see father, and the child appeared upset and said "because I'm frustrated." The child then appeared to shut down, as he kept nodding his head and stating "no" to every question about father without fully hearing the question.

The social worker reported that she privately asked the child how he felt about seeing father, and she observed that, when the topic of father came up, the child would withdraw by putting his head down and putting his hood on. He would not maintain eye contact and would talk in a low voice. The child consistently said he did not want to visit either parent. When the social worker told the child that father missed him and wanted to send him a note or photo, the child said he did not want a note or photo from father. Since the child's negative behaviors had stopped, and the child verbally stated that seeing father caused him emotional harm, the social worker concluded that she could not recommend play therapy.

The social worker additionally reported that both the family therapist and the DBH therapist talked to father about why the child's visits were detrimental, but father continued to blame the caregiver for him not being able to have visits. The social worker stated that father failed to understand that trauma affected the child. She further noted that the child was currently in a stable environment and was doing well academically, emotionally, socially, and physically. Therefore, the social worker recommended terminating father's services and setting a section 366.26 hearing, with adoption with the caregiver as the permanent plan. The child had been in her care for over a year, the

11

child's two half siblings were in the same home, and the caregiver was committed to adopting him.

The court held a contested 12-month status review hearing on July 21, 2020. Father argued that he had, in effect, been cut off from having any contact with the child for the past seven months and asked for additional six months of services to try some sort of therapy with the child. The court noted that the 18-month mark would actually be one month from that date. Thus, even if it extended services, it would only be for one month. The court further noted that, while father had completed significant portions of his case plan, he was still testing positive for substances. The court said it believed CFS had provided reasonable services, and that they tried visits, individual therapy with the child, and family therapy. It noted there was an abundance of evidence that the child was still suffering from trauma. The court then found, based on the record and the timing, there was no substantial probability of return. It followed the social worker's recommendation and terminated father services and set a section 366.26 hearing.

*Section 366.26 Hearing*

The social worker filed a section 366.26 report on November 4, 2020, recommending that parental rights be terminated and the permanent plan of adoption be implemented. The social worker reported that the child desired to remain with his caregivers and had asked if he was going to be adopted soon. The social worker reported that the child had been living with the prospective adoptive parents for 18 months, and they had a mutual attachment with him. They were fully committed to raising him into adulthood.

12

On January 19, 2021, the social worker filed additional information for the court and reported that she had a video chat with the child on January 12, 2021. She asked if he was visiting father at that time, and the child responded, "No!" When she asked if he wanted to visit father, he said, "I don't want to see or talk to my dad, ever!" He said he chose not to see father because his father was "a bad person." The child said he had witnessed father being abusive and recounted a time when he saw father push his grandmother against the wall and call her bad words in Spanish. The child also reported witnessing an altercation between father and mother, and said the parents would yell, scream, and hit each other. He said his parents were emotionally abusive toward him and the thought of them made him sick. The child said he became anxious and nervous around father because father was violent. The child added that he was traumatized by witnessing the police arrest father, and said he sought therapy due to his trauma. The social worker observed the child become emotional when talking about his parents and opined that a visit with either father or mother would be detrimental to his well-being.

The court held a section 366.26 hearing on January 29, 2021. Father objected to the termination of parental rights, arguing that CFS had not met its burden of figuring out a case plan that would have successfully reunified him with his son. He argued that CFS ceased all communication he had with the child, so that he "did not have the opportunity to continue on with the parental and child bond which then basically set[] him up for today to not be able to have any argument that it would be detrimental for this Court to terminate his parental rights based on the bond that he ha[d] with his son." Father asked the court to order legal guardianship instead of terminating his parental rights. The

13

child's counsel argued there was no evidence to support the parental bond exception and asked the court to follow the recommendation. County counsel added that the visits were not of the quality or consistency to meet the first prong of the parental bond exception, and that the court found the visits were detrimental, at one point. Counsel pointed out there was no bond between father and the child, as indicated by the child's recent comments that he did not want to have contact with father.

The court found the child adoptable, noted that it previously found visits detrimental, and said the only issue was whether there was an exception to the preference for adoption. The court stated there was no exception applicable, terminated parental rights, and found it in the child's best interest to be adopted.

DISCUSSION

The Beneficial Parental Relationship Exception Did Not Apply

Father contends the court erred in not applying the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i). He specifically argues that CFS and the court misunderstood what the child's therapist stated when he suggested the child take a break from therapeutic visits with father. He contends the court erroneously found the visits with him detrimental since it was "reliving past events by discussing them in therapy [that] was traumatizing, not the time spent with Father." He reasons that, as a result of his visits being terminated, he "was precluded from arguing the exception to termination of parental rights in full because the court and CFS did not allow him visitation." He asks this court to remand the matter for the juvenile court to find the exception applies. We conclude the court properly found the exception did not apply.

14

A. *Relevant Law*

At a section 366.26 hearing, the juvenile court selects a permanent plan for the dependent child. (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.) Permanent plans include adoption, guardianship, and long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296; § 366.26, subd. (b)(1)-(7).) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) A permanent plan of adoption necessarily involves termination of the biological parents' parental rights to the child. (*Id.* at p. 574.)

In selecting a permanent plan for the child, the court is first required to determine whether the child is likely to be adopted. (See § 366.26, subd. (c)(1).) If the court finds, based on clear and convincing evidence, that the child is likely to be adopted, and if there has been a previous court determination, by a preponderance of the evidence, that it would be detrimental to the child to return the child to his or her parent or guardian (§§ 366.21, 366.22), then the court is required to terminate parental rights and select adoption as the child's permanent plan, unless the parent shows that termination of parental rights would be detrimental to the child under at least one of several statutory exceptions to the adoption preference. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249; § 366.26, subd. (c)(1)(B)(i)-(vi).) "The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) The parental-benefit exception applies where the court finds a "compelling reason" for determining that termination of parental rights would be detrimental to the child because, in the words

15

of the statute, "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

Our Supreme Court recently clarified the proper application of the parental-benefit exception and, in doing so, discerned "three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).) As *Caden C.* indicates, the second and third elements of the exception are inextricably connected.

The *Autumn H.* court recognized this connection when it interpreted "the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child *to such a degree as to outweigh* the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, 27 Cal.App.4th at p. 575, italics added.)

We review the juvenile court's findings on the first two elements of the parental-benefit exception for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.)

16

"The determination that the parent has visited and maintained contact with the child . . . is essentially a factual determination.  It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it."  (*Ibid*.)  The third element—whether termination of parental rights would be detrimental to the child—is "somewhat different" in that it requires the court to "assess[] what the child's life would be like in an adoptive home without the parent in his life."  (*Id*. at p. 640.)  "The court makes the assessment by weighing the harm [to the child] of losing the relationship against the benefits [to the child] of placement in a new, adoptive home.  And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with [the] parent—is discretionary and properly reviewed for abuse of discretion."  (*Ibid*.)

A court abuses its discretion only when it " ' "has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' "  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)  A reviewing court should find an abuse of discretion, "only ' "if " ' " it finds that no judge could reasonably have made the decision that the judge did, when all of the evidence is viewed most favorably in support of the judge's decision.  (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

B.  *Father Maintained Regular Visitation to the Extent He Was Permitted*

Father argues he would have had consistent visits if the court had not terminated them, and he otherwise could have met the first prong of the beneficial parental relationship exception.  He also asserts that he had regular visits "within the time he was permitted."  As to this first element, "[t]he question is just whether 'parents visit

17

consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The record appears to show that father had regular visits until the court suspended them. In other words, he visited to " 'the extent permitted by court orders.' " (*Ibid.*)

C. *Father Failed to Establish the Child Would Benefit from Continuing the Relationship*

Assuming his visits were sufficient to meet the first prong of the beneficial parental relationship exception, father still failed to establish that the continuation of the relationship would benefit the child. When analyzing this element, courts look to "a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.]" (*Caden C.*, *supra*, 11 Cal. 5th at p. 632.) This often includes "how children feel about, interact with, look to, or talk about their parents." (*Ibid.*)

Father asserts that his relationship with the child was positive, and points out that during therapy sessions, he and the child "sat close, talked and [the child] did not appear in distress." However, father does not proffer any evidence to show the child would benefit from continuing the relationship. To the contrary, the record demonstrates that the relationship between him and the child had harmful effects on the child. In August 2019, the child's DBH therapist was concerned about the child's visits with family, noting that before and/or after visits, he displayed behaviors such as bedwetting, hitting himself and others, and crying episodes (collectively, the negative behaviors). The

18

therapist reported that the child continued to "experience negative symptoms and emotional dysregulation when faced with his trauma reminders." As a result, CFS asked the court to find that visits with father were detrimental and order them to be suspended until the therapist recommended them to continue in a therapeutic setting. On August 30, 2019, the court found the visits detrimental and authorized CFS to resume visits in a therapeutic setting when it was in the child's best interest.

On September 4, 2019, visits began in a therapeutic setting with a family therapist. However, the family therapist terminated visits after five sessions because the child's negative behaviors were continuing. The social worker reported that the family therapist terminated the sessions "to allow [the child] to rest from the intensity of traumatic symptoms," and noted that the child's negative behaviors were persisting.

Father contends the social worker misunderstood the family therapist's notes and claims it was the child having to relive his traumatic history (e.g., the physical abuse by mother's boyfriend) that was causing the child distress, not spending time with father. However, the family therapist commented that it was likely the child had some psychological damage from the domestic violence between father and mother. The therapist noted the child was having night terrors and nightmares the day before sessions with father and decided to terminate the therapeutic visits "due to exacerbated symptoms experienced by [the child.]" Contrary to father's suggestion, the therapist did not suspend the visits "due to the trauma associated with the therapeutic aspects of reliving the past, [rather than] the visits with father." The therapist associated the child's negative behaviors with visits with father and terminated the visits.

19

We note the therapist's assessment was corroborated by the caregiver's report that during the time the supervised visits were suspended, the child did not display the negative behaviors; however, the negative behaviors returned once therapeutic visits commenced. Similarly, the DBH therapist reported that when visits resumed with father in a therapeutic setting, the child regressed in therapy. She said he would put his hands to his face and hide in the couch during sessions. The DBH therapist was concerned about the child's negative behaviors following visits. However, his negative behaviors stopped around October 2019, which was when the therapeutic visits were terminated. We additionally note that, during this time period, the child participated in individual therapy sessions where he almost certainly had to relive traumatic experiences, and his therapist indicated that he did not exhibit the negative behaviors that were of concern when he spent time with father. We note that, in November 2019, the child said that not seeing his parents had been good since it helped him not hit himself anymore.

We additionally note the social worker observed that even talking about visiting father caused the child emotional distress. When she would bring up father in conversation, the child would withdraw by putting his head down, putting his hood on, talking in a low voice, and not maintaining eye contact. When she shared that father loved him and wanted to send him a note or photo, the child refused and said he did not want a note or photo from father. Furthermore, the child consistently told the social worker he did not want to visit father. Just weeks before the section 366.26 hearing, the child told the social worker, "I don't want to see or talk to my dad, ever!" He said his

20

parents were emotionally abusive toward him and the thought of them made him sick. The child said he became anxious and nervous around father because father was violent.

Thus, there was no evidence to support a finding that the child would benefit from continuing the relationship with father. Rather, the evidence showed that the child was negatively affected by his relationship with father.

D. *Termination of Father's Parental Rights Would Not Be Detrimental to the Child*

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Father claims "the court overlooked the detriment [to the child] from severing their otherwise healthy relationship." However, he has not proffered any evidence to support a finding that he had a "substantial, positive emotional attachment [with the child] such that the child would be greatly harmed" if the relationship was severed. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) In other words, the evidence fails to demonstrate that their relationship promoted the child's well-being "to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Moreover, the evidence showed the child was bonded with the prospective adoptive parents and saw them as his parents. By the time of the section 366.26 hearing, he had lived with them for 18 months, and they had a mutual attachment. They were meeting all his needs and were committed to raising him to adulthood. The social worker

21

reported that the child desired to remain with them and asked if he was going to be adopted soon.

Ultimately, father failed to meet his burden of showing that the child had a substantial, emotional attachment to him such that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child when balanced against the benefit of an adoptive home.  (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)  Therefore, the court properly declined to apply the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i).

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
                                                                                                J.

We concur:

RAMIREZ
                    P. J.

RAPHAEL
                    J.

22